UNITED STATES of America,
Plaintiff,

v.

NATIONAL MARITIME UNION OF AMERICA, Seafarers International Union of North America, National Marine Engineers' Beneficial Association, International Organization of Masters, Mates and Pilots, American Radio Association, Radio Officers Union, Staff Officers Association of America, American Merchant Marine Institute, Tankers Labor Services Committee, Pacific Maritime Association, Max Harrison, Mobile, Ala., Colliers Owners Association, Alcoa Steamship Company, Inc., Defendants.

United States District Court
S. D. New York.
July 10, 1961.

William H. Orrick, Jr., Asst. Atty. Gen., Robert M. Morgenthau, U. S. Atty., New York City, and Donald B. Mac-

Guineas, Atty., Dept. of Justice, Washington, D. C., for plaintiff.

Lee Pressman, New York City, for defendant National Marine Engineers' Beneficial Assn.

Marvin Schwartz, New York City, for defendant International Organization of Masters, Mates and Pilots.

Manning, Hollinger & Shea, New York City, for defendant American Merchant Marine Institute; William A. Shea, New York City, of counsel.

Cooper, Ostrin & DeVarco, New York City, for defendant National Maritime Union of America; H. Howard Ostrin, New York City, of counsel.

Proskauer, Rose, Goetz & Mendelsohn, New York City, for defendant Tankers Labor Services Committee; Edward Silver and Marvin E. Frankel, New York City, of counsel.

Louis Steinberg, New York City, for American Radio Assn.

Richard Markowitz, Philadelphia, Pa., for defendant Seafarers International Union of North America.

RYAN, Chief Judge.

This suit filed by the United States on July 3, 1961 arises out of a pending strike affecting the maritime industry and seeks to invoke injunctive remedies of the "National Emergencies" provisions of The Labor Management Relations Act as amended [§§ 206–210, 29 U.S.C.A. §§ 176–180].

It first came on to be heard on July 3, 1961, when the Government applied for a temporary restraining order ond for an order citing the defendants to show cause why a preliminary injunction should not issue. At that time a hearing was held; attorneys for the Government and the defendants were heard and affidavits were submitted. The notice of the hearing, given to the defendants by telephone by direction of the court, was but a few hours; this was because it was represented that prompt and immediate relief was required by the situation existing in the shipping industry due to the pending ship strike affecting the United States Merchant Marine Fleet.

At 8:00 p. m. on July 3, 1961, this court issued a temporary restraining order enjoining the defendants from continuing the strike. The court then found from affidavits submitted by the Government and by some of the defendants that "sufficient basis and evidence has been presented to support a finding that irreparable harm and injury will result unless a temporary restraining order is issued and that the dispute does presently imperil the national health and safety." Further findings were then made to comply with the provisions of Rule 65, F.R. Civ.P., 28 U.S.C.A., and a memorandum opinion was filed.

Later, on the evening of the same day, attorneys for parties to the suit appeared before Circuit Judge Clark of this Circuit. Defendants National Marine Engineers Beneficial Association, Seafarers International Union, and International Organization of Masters, Mates and Pilots were heard on an application for a stay of the restraining order until a hearing of the appeal which had been filed by these defendants from that order. Circuit Judge Clark denied the stay, rendering later a written opinion. United States v. National Marine Engineers Beneficial Ass'n, 2 Cir., 292 F.2d 190.

The restraining order of July 3, 1961 directed the defendants to show cause on July 7, 1961 why a preliminary injunction should not issue continuing in effect for the statutory period the provisions of the temporary restraining order and of appropriate additional provisions.

All parties were heard on July 7, 1961 and further affidavits were submitted by the parties. Decision was then reserved to afford an opportunity to consider the affidavits and memoranda of law submitted.

The restraining order was continued until 4:00 p. m., July 12, 1961.

The parties have stipulated that the suit be heard and determined upon the affidavits submitted. We have had no oral testimony.

We have concluded that the injunctive relief prayed for by the United States should immediately issue and we have so ordered and decreed.

The preliminary injunction may not issue unless this court has found that the existing strike involves a substantial part of an entire industry and that it threatens and imperils the national health and safety.

■ We are satisfied and find from the evidence that the strike does involve a very substantial part of the entire United States maritime industry with respect to trade, transportation and commerce among the several states and with foreign nations. This has been abundantly and overwhelmingly established.

We have before us the affidavit of Ralph E. Casey, President of the American Merchant Marine Institute, a defendant. Casey is also the Chairman of the Committee for Companies and Agents, Atlantic and Gulf Coasts. It was sworn to on July 7, 1961 and speaks of conditions in the industry "as of 12:00 o'clock noon, July 7, 1961." It states that as to the companies his Committee represents, the Colliers Owners Association and Alcoa Steamship Company, Inc. and the Unions, the status of bargaining negotiations is:

*National Maritime Union of America*

"A memorandum of understanding has been signed and ratified by the membership."

*National Marine Engineers' Beneficial Association*

"No agreement has been reached. Two or three companies may have signed separately after withdrawing from the Committee."

*International Organization of Masters, Mates and Pilots*

"A memorandum of understanding has been signed. * * * The officers of the union have announced that the total vote cast on the Atlantic and Gulf Coasts indicate ratification. * * *"

*American Radio Association*

"A memorandum of understanding has been signed which will be submitted to the membership for ratification on July 18, 1961."

This affidavit of Casey further states that as to the Unions and the Pacific Maritime Association, he is informed the status is:

*National Marine Engineers' Beneficial Association*

"A memorandum of understanding has been signed and submitted to the membership of the union for ratification. To date the agreement has been ratified by the Seattle and Portland locals. * * *"

*International Organization of Masters, Mates and Pilots*

"No agreement has been reached. The union has rejected an offer of the same form of agreement accepted by the Marine Engineers on the West Coast and has also rejected an offer of the same form of agreement accepted by the Masters, Mates and Pilots on the East and Gulf Coasts."

*American Radio Association*

"No agreement has been reached and no meetings have been held."

The affidavit also states that as to:

*Colliers Owners Association*

"No agreements have been reached with any of the four unions with which this defendant has contractual relations."

*Alcoa Steamship Company, Inc.*

"No agreement has been reached with the National Marine Engineers' Beneficial Association or the Seafarers International Union."

This affiant [President of American Merchant Marine] summarizes the present condition of the industry in the following language:

" * * * but for the injunction, 230 ships on the Atlantic and Gulf Coasts, owned and operated by employer companies represented by the Committee and a total of 617 ships, or approximately two-thirds of all the ships in the American Merchant

Marine, including all ships on the West Coast, would not be operating."

We have read the affidavit of Edward Silver, counsel to Tankers Labor Services Committee. This affidavit, sworn to July 7, 1961, states that as of 12:00 noon on that day, 120 of the 140 tankers operated by the twenty tanker companies listed in an affidavit of Stewart R. Udall, Secretary of the Interior, were strikebound and the remaining 20 tankers were at sea with "a certain prospect of being struck upon arrival at destination."

The affidavit further states that these tanker companies had reached tentative agreements with the National Maritime Union and the American Radio Association, but "these oral understandings were to be effective only upon the conclusion of satisfactory agreements with the International Organization of Masters, Mates and Pilots. No agreement has been reached thus far with the latter organization. * * *" It also states that negotiations with the Marine Engineers' Beneficial Association have not resulted thus far in an agreement.

We have considered the affidavit of Marvin Schwartz, counsel for International Organization of Masters, Mates and Pilots. This affidavit sworn to July 7, 1961, states that "a dry cargo collective bargaining agreement (as distinguished from a tanker agreement) was reached on July 2, 1961 by the Masters, Mates and Pilots with a portion of the maritime employers, owners and operators known as the 'Max Harrison group.'" This group includes the A. H. Bull Steamship Company, the major operator in the trade between the United States mainland and Puerto Rico.

It also states that on July 5, 1961 a dry cargo agreement was reached between the Masters, Mates and Pilots and American Merchant Marine, Inc., representing the remainder of the Atlantic and Gulf Coasts dry cargo fleet, and that this agreement has been ratified by the membership.

The affidavit further states that agreement has been reached by the Masters, Mates and Pilots with the owners of 25 tankers, and has received membership approval.

We have also weighed the affidavit of Charles M. Crooks, National President of the International Organization of Masters, Mates and Pilots.

This affidavit, sworn to on July 3, 1961, further states that he "personally signed the agreements which restored service between the United States and Puerto Rico" and "that all cargo certified by the Military Sea Transport Service have been promptly cleared."

We have the affidavit of Claude Simmons, Vice-President of Seafarers International Union of North America, Atlantic, Gulf, Lakes and Inland Water Districts.

This affidavit, sworn to July 6, 1961, states that this union is conducting at present a strike against but two shipping companies, Alcoa Steamship Company (which owns and operates 14 vessels) and Bloomfield Steamship Company (which owns and operates 4 vessels), and that "only seven of these vessels have been idled at various times since June 16, 1961."

It also appears from this affidavit that "the Seafarers International Union has collective bargaining agreements with approximately 80 shipowners who own and operate approximately 259 ships" and that agreement was reached on June 13, 1961 with all of these owners excepting Alcoa and Bloomfield.

A chart or statement submitted by the National Marine Engineers' Beneficial Association graphically illustrates the present industry-wide strike and bargaining situation, and divides the United States Merchant Fleet into the following groups and classes of ships (with the respective owner or operator bargaining agency).

*Vessels as to which Union strike continues:*

256—Dry cargo vessels represented by the American Merchant Marine Institute have not reached agreement with the Marine Engineers' Beneficial Association.

65—Tankers, represented by the Tankers Labor Services Committee (Cardinale), have not reached agreement with the Marine Engineers' Beneficial Association.

128—Dry cargo vessels, represented by the Pacific Maritime Association, have not reached agreement with the Masters, Mates and Pilots or American Radio Association.

8—Colliers have not reached agreement with any of the unions.

457 vessels as to which a strike is still in progress.

*Vessels as to which Unions have settled:*

259—Dry cargo vessels, represented by the "Max Harrison group," agreements reached with Seafarers International Union, Radio Officers Union, Masters, Mates and Pilots, and Marine Engineers' Beneficial Association.

51—Dry cargo vessels, operated by American Export and United Fruit, agreements reached with National Maritime Union and American Radio Association.

310 Vessels as to which agreements have been reached, not tied up by existing strike.

This same chart lists 153 vessels as not involved in the present dispute.

If we were to accept this chart as entirely accurate it reveals that of a total merchant fleet of 920 vessels, at present 457 of them are strikebound. This we find to be a substantial part of the maritime and shipping industry of the nation.

However, it appears from the affidavit of John A. Carver, Jr., Acting Secretary of the Interior, verified on July 6, 1961, that on July 3, 1961 over 50 per cent of the American flag tankers active in the Gulf Coast-East Coast service were strikebound. The number of strikebound tankers on this Gulf Coast-East Coast service run was stated to be 140 by Stewart L. Udall, Secretary of the Interior, in his affidavit verified on June 28, 1961. This same figure was again stated to be the number of strikebound tankers in the affidavit of Edward Silver, counsel to the Tankers Labor Services Committee. It appears that 140 strikebound tankers is the correct figure; this increases the number from 65 tankers stated in the chart of the Marine Engineers' Beneficial Association by 75, and would make, according to this chart, a total of 842 vessels which were involved in the dispute, of which 532 are strikebound vessels, save for the temporary restraining order. This we find is a very substantial part of the entire industry.

The affidavit of John A. Burke, Federal Mediation Commissioner, states that:

"Although some of the unions and employer groups have reached an agreement on the issues under discussion, other unions and other employer groups have reached no agreement."

And he points out that:

"Absent a complete agreement on behalf of all the unions involved, none of the ships involved can sail from American Ports."

We also find upon the evidence before us that this pending strike threatens and imperils the national health and safety.

Affidavits to establish this fact were submitted by the United States on the application for the temporary restraining order from:

Secretary of the Interior—Stewart Lee Udall

Secretary of Agriculture—Orville L. Freeman

Secretary of Commerce—Luther H. Hodges

Secretary of Labor—Arthur J. Goldberg

Governor of Hawaii—William F. Quinn

Governor of the Commonwealth of Puerto Rico—Luis Munoz Marin

Chairman of Federal Maritime Board and Maritime Administrator—Thomas E. Stakem

Deputy Director for Operation of the International Cooperation Administration—D. A. Fitzgerland.

Now as additional evidence the United States has submitted further affidavits from:

Secretary of the Treasury—Douglas Dillon

Secretary of Defense—Robert S. McNamara

Secretary of Labor—Arthur J. Goldberg

Commissioner of the Federal Mediation and Conciliation Service—John A. Burke

Director of Federal Mediation and Conciliation Service—William E. Simkin,

And a copy of a radiogram dated July 6, 1961 from Governor Quinn of Hawaii.

█ The duty of the court on this application is confined to "finding, upon the evidence adduced, whether a strike or lockout meets the statutory conditions of breadth of involvement and peril to the national health and safety" [United Steelworkers of America v. United States, 1959, 361 U.S. 39, 41, 80 S.Ct. 1, 3, 4 L.Ed.2d 12]. This court has the sole authority under § 208 of the Act to determine whether there is a strike which gives it jurisdiction to issue an injunction.

While the court has great respect for the reasoned judgment and opinion of those charged with directing the affairs of our country, it has made its own examination and appraisal of the evidence and has reached its own independent conclusions.

We are convinced by this evidence, and find that the pending strike is a peril to our national health and safety.

We do not here review in extenso these affidavits because as to this matter we have later stated in detail our specific findings.

The defendants MEBA and MMP contend that they represent "supervisors" within the meaning of Section 101(11) of the Act, 29 U.S.C.A. § 152(11); that "supervisors" are not "employees"; and that therefore their participation in the strike may not be enjoined under Section 208 of the Act, 29 U.S.C.A. § 178. We find no support for this contention in the legislative history or the applicable provisions of the Act. Such a construction would frustrate the policy of the provisions for a resumption of operations and a "cooling off" period, and would destroy the statutory plan.

The preamble to the Act states this:

"Industrial strife which interferes with the normal flow of commerce * * * can be avoided or substantially minimized if employers, employees, and labor organizations each * * * above all recognize under law that neither party has any right in its relations with any other to engage in acts or practices which jeopardize the public health, safety, or interest * * *."

The purpose of the injunction filed under the national emergency provisions of the Act is to protect the national health and safety; and the court acts in the public interest in enjoining a strike and ordering operations to be resumed.

The injunctive relief contemplated and authorized by the Act would be ineffectual and futile unless it extended to all involved in the industry dispute. It is designed to terminate the work stoppage, to start the industry once again into motion and to end the interruption of its operations so that the peril to the health and safety of the nation is removed. All parties involved in the dispute, all employees, whether they exercise a measure of supervisory authority over some of their fellow workers or not, and all employers and management are made subject to and brought within the reach of the preliminary injunction, which the Congress has authorized the district court to issue when the requirements of the Act are met by the evidence presented by the Government.

Certainly a vessel cannot go to sea and safely navigate without a complement of

qualified and licensed personnel; this includes mates and engineers who must supervise and direct the work of the seamen and crew. To direct all others to return to normal operations and to exempt mates, engineers and others aboard ship who supervise the work of the crew, would be a silly and idle gesture.

Circuit Judge Clark, in his opinion denying a stay of the restraining order issued in this suit, observed that:

"Obviously ships cannot run without engineers, masters, mates, and pilots; if they are not within the statutory scope, the law is sadly deficient." [292 F.2d 192.]

The Congress did not intend to exclude these men as "supervisors" from the operation of the sections of the Act dealing with national emergencies and by the Act it did not so provide. They are traditionally and by maritime law no part of the management of the owners and operators of the vessel, but even if they were held to be, they would be included in the parties subject to the Act.

In the final analysis, the position of these defendants is that Congress intended that employers and employees shall be restrained from imperiling the national health and safety, but that supervisors are outside the scope of the injunction and therefore free—by continuing their work stoppage—to imperil the health and safety of the nation. Such a legislative purpose does not appear and cannot be assumed.

While Congress did provide that the term "employee" does not include supervisors [29 U.S.C.A. § 152(3), 164(a)], these provisions were intended to and do relate to the process of collective bargaining between employers and employees; and were designed to align supervisors with management for this phase of labor relations. See Senate Report No. 105 on S. 1126, 80th Cong., 1st Sess., Legislative History of the Labor-Management Relations Act of 1947, Vol. 1, p. 409 (hereafter Leg. Hist.).

Vis-à-vis the public safety, health and interest, it is immaterial whether supervisors are employees or management or an in-between hybrid. An injunction is useless unless it terminates the "stoppage of work" or the "interruption of operations" in the industry by reaching all who cause or contribute to it.

The International Organization of Masters, Mates and Pilots, composed of licensed deck members of the crew, is essentially a craft union, so too, the National Marine Engineers' Beneficial Association, composed in part of the licensed engine room members of the crew, is a craft union. It is clear that these craft members of the crew do not have authority in the interest of the shipowner to "hire" or to "discharge" those who may work aboard ship under their direction [§ 2(11) of the Act].

We conclude that these unions and their members are included among those subject to the national emergency provisions of the Act.

It appears from the second report of the Board of Inquiry dated July 2, 1961, that it also considered proposals for minimizing the effect of the strike made by the National Maritime Union, American Radio Association, and International Organization of Masters, Mates and Pilots. They then proposed and again suggest to to the court, in lieu of the issuance of a preliminary injunction, the establishment of a "National Health, Safety, and Military Cargo Clearance Board" on which both union and management would be represented.

These defendants as part of a rather complicated scheme, would provide that this Board would have power to determine whether any particular ship should sail in order to avoid imperiling the nation's health and safety, to consolidate all essential supplies into full cargoes, and to remove all non-essential cargoes from any ships cleared to sail. This proposed Clearance Board, under the suggested plan, would also assume reponsibility for the clearance of military cargoes which were then being cleared upon request of the Military Sea Transportation Service. Upon the recommendation of the Clearance Board, which would work

with the Secretary of Labor, the unions endorsing this proposal would remove the picket lines from the "cleared" vessels.

The Board of Inquiry concluded that this proposed National Health, Safety and Military Cargo Clearance Board could not achieve these purposes and therefore should not be adopted.

The Board of Inquiry also reported that objections to the proposal had been received from the Tankers Labor Services Committee, the Pacific Maritime Association (PMA) and the American Merchant Marine Institute (AMMI). These objections detailed technical difficulties inherent in the proposal.

The statute, the Supreme Court has written, "was designed to provide a public remedy in times of emergency," and the Government is not required "either [to] formulate a reorganization of the affected industry to satisfy its defense needs without the complete reopening of closed facilities, or demonstrate in court the unfeasibility of such a reorganization" [United Steelworkers of America, supra, 361 U.S. at page 43, 80 S.Ct. at page 4].

But aside from all else the statute imposes on the court the obligation to issue an injunction upon a sufficient showing. There is no grant of jurisdiction which would empower this court to attempt to set up and thereafter regulate, direct and control such an involved and impractical plan as is proposed or to substitute such a plan in lieu of injunctive relief.

We have concluded that the preliminary injunction should issue as provided for by the Act.

### Findings of Fact

Specifically, upon the evidence presented, I do make the following findings of fact:

(1) The defendant unions: National Maritime Union of America, Seafarers International Union of North America, National Marine Engineers' Beneficial Association, International Organization of Masters, Mates and Pilots, American Radio Association, Radio Officers Union, Staff Officers Association of America represent among others, employees of various of the other named defendants, and are employees the maritime industry, an industry engaged in trade, commerce and transportation among the several states and with foreign nations. The other named defendants (referred to in the complaint as "employers") serve as the bargaining agencies with respect to rates of pay, wages, hours, terms and conditions of employment, of employers which are steamship companies or operators of or agents for ships in the maritime industry—save only for the defendant Alcoa Steamship Company, Inc., which is an owner and operator of ships in the maritime industry and an employer of the members of some of the defendants unions.

(2) The strike, affecting a very substantial part of the maritime industry of the United States, commenced on June 16, 1961 and arose as a result of a labor dispute existing between the defendant unions and the defendant "employers". This strike continued and did continue to affect a very substantial part of the maritime industry of the United States, until this court issued at 8:00 p. m. o'clock Eastern Daylight Time on July 3, 1961 a temporary restraining order enjoining the continuance of the said strike.

(3) On June 26, 1961, the President of the United States, acting under the provisions of Section 206 of the Labor Management Relations Act, 1947 (29 U.S.C.A. § 176), issued Executive Order 10949 (26 F.R. 5731), U.S.Code Congressional and Administrative News 1961, p. 2308, whereby he found that such dispute resulted in a strike affecting a substantial part of the maritime industry, an industry engaged in trade, commerce and transportation among the several states and with foreign nations, and that such strike, if permitted to continue, would imperil the national health and safety The President, by said Executive Order, appointed a Board of Inquiry to inquire into the issues involved in such labor dispute.

(4) The Board of Inquiry inquired into the issues involved in the dispute and rendered its written report, dated July 2, 1961, to the President on July 3, 1961.

(5) After receipt of the report, the President, on July 3, 1961, directed the Attorney General, pursuant to the provisions of Section 208 of the Act (29 U.S.C.A. § 178), to petition in the name of the United States any district court of the United States having jurisdiction of the parties to enjoin the continuance of such strike and for such other relief as may be necessary or appropriate.

(6) Thereupon, on July 3, 1961, the Attorney General filed in this court this suit on behalf of the United States of America against the defendants.

(7) After the filing of the verified complaint and accompanying affidavits and exhibits, and after hearing some of the named defendants and receiving affidavits from them, and after due consideration thereof, this court, at 8:00 p. m. o'clock (EDT), on July 3, 1961, issued a temporary restraining order. At that time the court made and filed a statement pursuant to Rule 65, F.R.Civ.P., as to the nature of the injury, why it was irreparable, and why the order was granted without notice (although counsel for certain of the defendant unions did appear and some of them opposed by oral argument and with affidavits the plaintiff's application for the temporary restraining order). The restraining order provided that it would expire at 12:00 noon o'clock (EDT) on July 8, 1961, unless it should be extended for good cause shown or with the consent of defendants.

(8) The verified complaint, the affidavits and exhibits annexed thereto, the temporary restraining order with the attached statement issued by the court, and plaintiff's motion for a preliminary injunction have been served upon defendants.

(9) Certain of the defendant unions have entered into agreements with certain of the defendant bargaining agencies of the steamship companies or operators of or agents for ships. Certain of the defendant unions have not as yet, however, entered into agreements with certain of the defendant bargaining agencies of the ship operators, and some of the agreements which have been entered into have not been ratified by the respective unions' members. At present there are at least 532 vessels strikebound out of a total of 842 vessels in the United States Merchant Marine fleet. The extent to which such agreements have been entered into and ratified does not terminate the likelihood that vessels of the merchant marine would continue to be prevented by the strike from sailing, in the absence of an injunction issued by this court, since a particular vessel could not sail if any one of the unions, the members of which constitute the officers or crew of such vessel, were to remain on strike.

(10) Unless the Court grants a preliminary injunction, the defendant unions will, upon the expiration of the temporary restraining order, resume the strike in the maritime industry.

(11) The strike by the defendant unions consisted of a concerted stoppage of work on the part of said defendants, not the exercise of the right of individual employees to quit their labor, as set forth in Section 502 of the Act (29 U.S. C.A. § 143), and resulted from an unresolved labor dispute between the defendant unions and the defendant bargaining agencies for steamship companies or operators of or agents for ships in the maritime industry. The strike has affected a very substantial part of the maritime industry, as we have hereinbefore found in detail.

(12) The strike, if permitted to resume or to continue, will imperil the national health and safety in the following respects:

(A) It would seriously disrupt the operation of the program under the Mutual Security Act of 1954, as amended, 22 U.S.C.A. § 1750 et seq., to provide military, economic, and technical assistance to friendly foreign nations, which is an important program adminis-

tered by the Inter-National Cooperation Administration to promote the foreign policy of the United States and to maintain its national defense and security;

(B) It would have a serious adverse effect upon the government's Food for Peace programs under the Agricultural Trade Development and Assistance Act of 1954, as amended (7 U.S.C.A. § 1691 et seq.), which programs are designed to promote the economic stability of American agriculture and to make the maximum efficient use of surplus agricultural commodities in furtherance of the foreign policy of the United States by furnishing emergency assistance to friendly nations to meet famine and other urgent relief requirements;

(C) It would have an adverse effect upon the maintenance in this country of an adequate supply of petroleum products, which is essential to transportation, both military and civilian, and for the operation of industrial plants and electric utilities and for heating;

(D) Since the American merchant marine is intended, pursuant to the Merchant Marine Act, 1936 (46 U.S.C.A. § 1101 et seq.), to be available as a naval and military auxiliary in time of war or national emergency, the strike, by rendering the merchant marine inoperative, would constitute a serious risk to the national health and safety.

(E) It would have an adverse impact upon the nation's economy and thereby seriously impair the nation's overall defense position, since the defense effort of the United States is dependent upon the strength of the economy of the United States.

(F) It would have a critical impact upon Hawaii, which occupies a key position in our defense structure, because Hawaii's supply of essential foods (taking into account the time required for transportation from the West Coast to Hawaii) would be exhausted and its basic sugar and pineapple industries would have to shut down for lack of storage space.

## Conclusions of Law

This court makes the following conclusions of law:

(1) The Court has jurisdiction of the subject matter of this suit and of the parties.

(2) All statutory requirements of Sections 206–208 of the Act (29 U.S.C.A. §§ 176–178) as to executive action to be taken prior to the commencement of this suit have been fully complied with.

(3) The work stoppage was a strike on the part of the defendant unions and did not constitute the exercise of the right of individual employees to quit their labor, as set forth in Section 502 of the Act (29 U.S.C.A. § 143).

(4) The strike affected a substantial part of the maritime industry, which is an industry engaged in trade, commerce, and transportation among the several states and with foreign nations.

(5) The strike, if permitted to continue or to be resumed, would imperil the national health and safety and thereby cause irreparable injury to the United States of America, for which there is no adequate remedy at law.

(6) Plaintiff, the United States of America, is entitled to the preliminary injunction issued by the court.

The task of this court now is to fashion an injunction and to frame a decree operative for the statutory period which will protect the national interest, preserve the existing contract and traditional rights of the workers and employers involved in the dispute, particularly as to wages, hours and working conditions. The injunction will not only allow for but will serve to encourage free collective bargaining to ensue.

We have endeavored to draw the terms of the injunction with a purpose to encourage the parties to continue to bargain with government assistance in the form of mediation and to do so during a period in which with their past status preserved, they may discuss and compose their differences in an atmosphere conducive to free and intelligent collective bargaining.

We have signed a preliminary injunction. This court, should occasion so require, will hear either by consent or on short notice, any application to modify the terms of the injunction as signed.