UNITED STATES of America,
Plaintiff,

v.

INTERNATIONAL LONGSHOREMEN'S
ASSOCIATION, AFL–CIO, New York
Shipping Association, Defendants.

No. 71 Civ. 5161.

United States District Court,
S. D. New York.

Dec. 3, 1971.

Addendum Dec. 10, 1971.

Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., for plaintiff by Michael D. Hess, Asst. U. S. Atty., L. Patrick Gray, III, Asst. Atty. Gen., and E. Grey Lewis, Deputy Asst. Atty. Gen., Civil Div., Washington, D. C.

Waldman & Waldman, New York City, for defendant International Longshoremen's Assn., AFL-CIO by Louis Waldman, Seymour Waldman, and Martin Markson, New York City, of counsel.

Lorenz, Finn, Giardino & Lambos, New York City, for defendant New York Shipping Assn. by Alfred Giardino, C. P. Lambos and Jacob Silverman, New York City, of counsel.

BONSAL, District Judge.

At a hearing held on December 3, 1971 on plaintiff's motion for a preliminary injunction the Court dictated to the reporter its finding of fact and conclusions of law as hereinafter set forth and signed the preliminary injunction which follows:

This cause having come on for hearing on the application of the plaintiff, the United States of America, for a preliminary injunction as prayed for in its verified complaint, and the

Court having considered all the evidence submitted herein, the pleadings, memoranda of law and the arguments of counsel, the Court makes the following findings of fact and conclusions of law:

### Findings of Fact

1. On September 30, 1971, collective bargaining agreements between the defendant union and the defendant Shipping Association expired. On October 1, 1971, a strike commenced by the members of the defendant ILA in the Greater New York port area and vicinity and other Atlantic and Gulf ports.

2. On October 5, the President of the United States, acting under the provisions of Section 206 of the Labor Management Relations Act of 1947, 29 U.S.C. Section 176, issued Executive Order 11621, whereby he appointed a Board of Inquiry to inquire into the issues of said labor dispute.

In said Executive Order the President expressed the opinion that such disputes had resulted in a strike affecting a substantial part of the maritime industry, an industry engaged in trade, commerce, transportation, transmission or communication among the several states and with foreign nations, and which strike would, if permitted to continue, imperil the national health and safety.

3. The Board of Inquiry appointed by the President issued two reports, the first one on October 6, 1971 and a supplemental report on November 25, 1971, to the President.

After receipt of the supplemental report of the Board of Inquiry, the President on November 25, 1971 directed the Attorney General, pursuant to provisions of Section 208 of the Act, to petition in the name of the United States in any district court of the United States having jurisdiction of the parties, to enjoin the continuance of the strike and for such further relief as might be appropriate.

4. Thereupon, on November 26, 1971, the Attorney General brought this action under the national emergency provisions of the Act on behalf of the United States of American against the International Longshoremen's Association, AFL–CIO and the New York Shipping Association.

5. Upon the filing of the verified complaint and the accompanying affidavits and exhibits, and after due consideration thereof, this Court, at 6:30 p. m. Eastern Standard Time on November 26, 1971, issued a temporary restraining order as prayed for by the plaintiff, which restraining order provided that it would expire at 6:30 p. m. Eastern Standard Time on December 6, 1971, unless before such time the order should be extended for good cause shown or unless the defendants consented to an extension of the order for a longer period.

6. Copies of the verified complaint and of the affidavits filed by plaintiff and the defendants, and of the temporary restraining order and of plaintiff's motion for a preliminary injunction, have been duly served upon both the defendants in this proceeding.

7. Following service of the temporary restraining order the defendant ILA terminated the strike and a majority of its members have returned to their normal employment.

8. Unless the Court grants a preliminary injunction, the defendant ILA upon the expiration of said temporary restraining order could resume said strike in the Greater New York area.

9. The strike by the defendant ILA has been a concerted stoppage of work and not the exercise of the right of individual employees to quit their labor as set forth in Section 502 of the Act.

10. The strike during its 56 days duration has affected, and if permitted to resume will affect, a substantial part of the maritime industry of the United States.

11. The parties have stipulated that the affidavits filed by representatives of the Government constitute the testimony which these witnesses would give if they were to appear in this court.

12. From a review of these affidavits I find, according to Secretary Hodgson, Secretary of Labor, that the strike involves vessels of United States and foreign registries and has drastically reduced freight shipments going in and out of struck ports, has idled merchant seamen, cargo repairmen and other dockside employees.

J. Phil Campbell, the Acting Secretary of Agriculture, has indicated that the strike has had a serious adverse effect on the farmers of the United States and has caused a serious dislocation of transportation facilities, with the accompanying risk of danger of deterioration of their crops.

Mr. Lynn, the Acting Secretary of Commerce, estimates that in the strike in the Greater New York area and the other strikes which have been in effect between October 1 and November 22, an estimated 45,000 longshoremen have been on strike and he estimates their loss of wages at $48.9 million. In Mr. Lynn's opinion the continuance of the strike would idle many additional thousands of workers, including seamen, teamsters and office workers.

Mr. Lynn states that more than 2,000 employees of freight forwarders of the City of New York have been laid off and that up to 90 per cent of the staffs of importers and exporters have been furloughed. He states that United States seamen are suffering a loss in direct wages of approximately $157,000 per day during the strike and that their cumulative loss of wages from October 1 to November 22 has been in excess of $5.3 million.

Mr. Blackwell, the Deputy Assistant Secretary of Commerce and Acting Maritime Administrator, states that as of November 22, 1971, 95 U.S. flag ships were strikebound in Atlantic and Gulf ports.

Mr. Byrne, Chief of the Section of Railroads of the Interstate Commerce Commission, states that for the week ending November 13, 1971 approximately 2,000 railroad cars were immobilized in ports by reason of the strike, and he estimated that an additional 2,000 cars had been immobilized en route to the ports.

Mr. Laird, the Secretary of Defense, states that if the strike should continue it would adversely affect cargo shipments on ocean vessels, and that even though the union may agree to handle essential military cargo, because of the tying up of bottoms the strike will nevertheless seriously impair the ability of the Department of Defense to meet its overseas commitments in timely fashion.

13. On the basis of the affidavits, it appears that a resumption of the strike here would adversely affect the nation's ability to sustain the level of expenditures now being made abroad for the common security to the extent that the overall balance of payments position would be adversely affected, and indeed there is evidence that for the first time in a great many years our nation is facing an adverse balance of trade.

14. Having read these affidavits, I am satisfied that a resumption of the strike would affect the lives and welfare of many thousands of people in the United States, including of course the strikers themselves and many others who are dependent in some way on the continuance of our foreign trade and of our transportation system, and because of this, if the strike should resume, it would imperil the national health and safety and cause irreparable damage and injury to the United States.

15. And I also conclude that the plaintiffs do not have an adequate remedy at law.

Conclusions of Law

1. I find, in my conclusions of law, that this action was properly instituted under the national emergencies provision of the Labor Management Relations Act of 1947, Sections 206–210, 29 U.S.C. Sections 176–180, and that the statutory provisions have been legally complied with both prior to and in the commencement of this action by the United States.

2. This Court has jurisdiction of the subject matter and also of the parties.

3. The strike, which had continued for 56 days, did not constitute the exercise of the right of individual employees to quit their labor, as set forth in Section 502 of the Act.

4. And I find that the strike in the Greater Port of New York is one which has affected a substantial part of the industry which is engaged in trade, commerce and transportation among the several states of the United States and with foreign nations, and I conclude that the strike, if permitted to resume, would imperil the national health or safety of the United States and cause irreparable injury to the people of the United States, for which there is no adequate remedy at law.

5. Finally, I conclude that the plaintiff, the United States of America, is entitled to the relief of a preliminary injunction.

## PRELIMINARY INJUNCTION

This matter came on to be heard on the 3rd day of December 1971, on the verified complaint of the United States of America and the exhibits and affidavits attached thereto together with affidavits filed by defendants, and upon the plaintiff's application for a preliminary injunction against the defendants, and each of them, and it appearing to the Court that the defendants hereinafter referred to as the "Companies", and the defendant International Longshoremen's Association, AFL-CIO, and its locals, are engaged in unresolved labor disputes and that such disputes have resulted in a strike affecting a substantial part of the maritime industry of the United States, which is engaged in trade and commerce, transportation, transmission and communication among the several States and with foreign nations, and that such strike, if permitted to continue or recur, will imperil the national health and safety; that plaintiff is threatened with irreparable injury for which it has no adequate remedy at law; and it further

clearly appearing to the Court, from the verified complaint and the exhibits and affidavits annexed thereto, that immediate and irreparable injury, loss and damage would result to the United States of America,

Now, therefore, it is by the Court this 3rd day of December 1971, ordered:

1. That the defendants and each of them and their officers, agents, servants, and employees, and all persons in active concert or participation with them be and they hereby are enjoined (a) from in any manner continuing, encouraging, ordering, aiding, engaging, or taking any part in any strike or lock-out in the maritime industry of the United States and (b) from in any manner interfering with or affecting the orderly continuance of work in said industry at the same rates of pay, hours of labor, and other terms and conditions of employment in effect immediately prior to October 1, 1971, subject to such modifications as the defendants may agree upon and from taking any action which would interfere with this Court's jurisdiction in the premises.

2. That the members of defendant International Longshoremen's Association, AFL-CIO, and its locals acting in concert, be and they hereby are enjoined from in any manner continuing, encouraging, ordering, aiding, engaging or taking any part in any strike or lock-out in the maritime industry of the United States, and from in any manner interfering with or affecting the orderly continuance of work in said industry, and from taking any action which would interfere with this Court's jurisdiction in the premises; provided, however, that nothing in this paragraph shall be construed to require an individual employee to render labor or service without his consent nor to make the quitting of his labor or service by an individual employee an illegal act.

3. That the defendant International Longshoremen's Association, AFL-CIO, and its locals, and their respective appropriate officers, agents, servants, and em-

ployees, be and they hereby are, directed (a) to instruct immediately all members employed in the maritime industry of the United States to resume their normal employment, and (b) to take all action which may be necessary to insure that such instructions are carried out.

4. That in order of implement the rights of employees to the benefits provided in this order, for the period during which this preliminary injunction shall be in effect,

(a) all direct employers of labor in the Port of Greater New York and vicinity shall make all man-hour contributions to the New York Shipping Association in the same amount, the same manner, and under the same conditions, as was required prior to October 1, 1971, and

(b) all vessel carriers or their agents shall pay all tonnage assessments to the New York Shipping Association applicable to each ton of cargo loaded or discharged in the Port of Greater New York and vicinity by longshoremen working pursuant to this order, in the same amount, the same manner, and under the same conditions, as was required prior to October 1, 1971; provided, however, that the rights of employees to the benefits provided in this order shall be independent of the obligations, and their compliance therewith, of direct employers, carriers or their agents imposed by this paragraph 4.

5. The defendants are directed to engage in free collective bargaining in good faith for the purpose of resolving their dispute and to make every effort to adjust and settle their differences.

6. This injunction shall remain in full force and effect until the further order of this Court, subject to the provisions of the Taft-Hartley Act.*

ADDENDUM

All parties consented to the form of preliminary injunction which was entered as aforesaid with the amendments which were made in the course of the hearing.

In considering whether the continuance of the strike would imperil the national health and safety of the United States, the Court necessarily considered that the strike affected not only the greater New York area, but the other Atlantic and Gulf ports as well.

The Court has carefully considered the points raised by counsel for the defendant New York Shipping Association at the time of the hearing on the temporary restraining order, the affidavits of James J. Dickman and Theodore Christopher, and the report of the United States Department of Labor entitled "Impact of Longshore Strikes on the National Economy, January 1970" (which was referred to as "the Schultz Report"), filed in opposition to the temporary restraining order. The Schultz Report suggested that previous longshoremen strikes "had no visible impact on the economy as a whole", and "did not significantly affect the national well-being", and "that the economic impact of strikes on the economy are usually seriously exaggerated." However, this strike had already continued for 56 days at the time of the hearing on the temporary restraining order, so that its impact was clearly demonstrable. Moreover, economic statistics alone cannot resolve the issue of whether the continuance of the strike would imperil the health and safety of the United States. These statistics must be considered in the light of the hardship the strike causes to the people of the United States, both those already directly and indirectly affected by the strike and the many others who will be affected by the decline in our international trade, and by the adverse effect on our national transportation and distribution system if the strike is allowed to continue. The Government's affidavits amply demonstrated that the continuance of the strike would affect large segments of people, including the long-

* Attached to the preliminary injunction is a list of carriers which were operating in the Port of New York on September 30, 1971.

shoremen themselves, those engaged in foreign trade, producers and farmers. The Court is satisfied that to allow the continuance of the strike would imperil the national health and safety of the United States.