SHEET METAL WORKERS' INTERNA-
TIONAL ASSOCIATION AFL–CIO and
Local Union No. 80, Sheet Metal Work-
ers' International Association, Petition-
ers,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 91–1642.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 25, 1993.
Decided April 6, 1993.

Donald W. Fisher, Toledo, OH, with whom Samuel C. McKnight, Southfield, MI, and Judith E. Rivlin, Washington, DC, were on the brief, for petitioners.

Julie Broido, Atty., N.L.R.B., with whom Jerry M. Hunter, Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, and Peter Winkler, Supervisory Atty., N.L.R.B., Washington, DC, were on the brief, for respondent.

Before BUCKLEY, SENTELLE, and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

Sheet Metal Workers International Association, AFL–CIO and Local Union # 80 (collectively "union") petitions for review of an order of the National Labor Relations Board ("NLRB") finding that the union had committed unfair labor practices in violation of §§ 8(b)(4)(i) and (ii)(B) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4)(i) and (ii)(B) (1988) ("the Act"), by inducing employees of Limbach Company to leave their employment, by disclaiming interest in representing the employees, and by repudiating the parties' prior bargaining relations, all with an objective of unionizing an affiliated corporation. The Board cross-petitions for enforcement of its order. While we reject the Board's determination that mass resignations by Limbach's union employees constituted a strike, and therefore conclude that no violation of § 8(b)(4)(i) occurred, we uphold the Board's finding of an unfair labor practice in violation of § 8(b)(4)(ii), insofar as the union's refusal to renew labor agreements with Limbach was designed to coerce a change in the non-union status of Harper Mechanical Corporation.

## I. BACKGROUND

### A. *Facts*

Limbach Company ("Limbach"), a mechanical contracting firm with branches in Boston, Columbus, Detroit, Pittsburgh, and Los Angeles, was for many years a union contractor and a member of a multi-employer bargaining association in each of the metropolitan areas in which it operates. With specific reference to the present case, the Detroit shop had a pre-hire agreement under § 8(f) of the Act [1] with Sheet Metal Workers Local Union # 80 for several years until the events which gave rise to

---

1. Section 8(f) of the Act, 29 U.S.C. § 158(f), allows construction industry employers and unions to enter into "pre-hire" agreements without regard to whether the union has established its majority status under § 9 of the Act.

the present litigation. In 1982–83, Limbach reorganized and became a wholly-owned subsidiary of Limbach Constructors, Inc. ("LCI"). As an additional part of the reorganization, Jovis Construction was formed as a second wholly-owned subsidiary of LCI for the purpose of acquiring non-union operations in new geographic areas. In July 1983, Jovis purchased Harper Plumbing and Heating, Inc., for thirty years a non-union contractor in Florida.

Shortly after the Limbach corporate family acquired Harper, Edward Carlough, President of the International Union, wrote Walter Limbach, President of Limbach, President of LCI and Chairman of the Board of Limbach, congratulating him on "your company's takeover of" Harper and praising him as "very thoughtful" in having the union "organize this firm through your purchase of it." Carlough added that a union representative would contact Limbach to "consummate a labor agreement with your new shop."

Charles Prey, Walter Limbach's successor as President of Limbach, responded by letter that Limbach had not "take[n] over" Harper, and that the company was not authorized to enter a collective bargaining agreement on Harper's behalf. Walter Limbach subsequently made a similar response when he was contacted again by Carlough. The next month, Carlough's assistant warned Limbach that "if Limbach Company persisted in refusing to see to a collective bargaining agreement with Harper[,] ... there would be ... 'labor troubles' for Limbach Company."

After further communication, both through correspondence and conference, in September of 1983, the union representative again warned Walter Limbach that if the Limbach Company refused to see to a collective bargaining agreement with Harper, there would be "labor troubles for Limbach Company." Walter Limbach replied that any effort to compel Limbach to force Harper to sign a contract would be an illegal secondary boycott. International's president stated that he was not concerned about that and added that if he did not succeed in using Limbach's collective bargaining agreements to unionize Harper's employees, he would await expiration of the collective bargaining agreements in all five of Limbach's cities of operation; direct the locals to disclaim their rights to represent Limbach's employees; and refuse to allow the locals to renew contracts with Limbach.

In December 1984, Local 80 filed a grievance against Limbach, alleging that the company was violating its contract by remaining part of a corporate structure operating a non-union business and requesting as a remedy that "Limbach [and] Jovis should be ordered to divest its ownership interest in Harper." The locals holding § 8(f) agreements with the Limbach shops in Boston, Pittsburgh, Columbus, and Los Angeles filed similar grievances. In May 1985, the arbitration panel on Local 80's grievance issued a decision stating that the panel was deadlocked.

In March 1985, the International adopted a ban on union dealings with employers who operated in a "double-breasted" manner, that is, through two companies, one union and one non-union. *See Sheet Metal Workers, Local Union No. 91 v. NLRB*, 905 F.2d 417, 419 (D.C.Cir.1990). International announced that such employers would have to "make a decision that they're either 100% union or 100% non-union." International adopted further measures designed to require its locals to follow a new policy of not dealing with affiliates of "double-breasted" operators, rendering those previously organized shops non-union. It also announced that it would eliminate certain benefits of members who worked for non-union contractors, including early and disability retirement, free prescription drugs, pre-paid legal services, and cost-of-living increases.

Thereafter, Carlough spoke at the International convention, outlining the union's campaign against Limbach and reiterating the union's resolve to terminate the bargaining agreements unless Limbach "straighten[ed] out the situation." At the same convention, the International amended its constitution to impose penalties against members employed by companies

that performed work within the union's jurisdiction but who were not party to collective bargaining agreements with the union.

In February 1988, Carlough directed the business manager of Local 80 in Detroit to serve notice on Limbach disclaiming interest in representing Limbach's employees after the collective bargaining agreement expired on May 31. Carlough also sent a "love note" for departing Limbach employees to distribute on the job site on their last day, which explained the union's "mission against the double-breasted employer" and urged employees to read a Carlough article condemning Limbach. The business manager sent Limbach a letter stating the union's intent to terminate its current collective bargaining agreement upon its expiration, disclaiming all rights to bargain collectively on behalf of Limbach employees, and refusing to bargain with Limbach in the future.

In a March 21 meeting with the Detroit employees of Limbach, the Local 80 representative announced the termination of contractual relationship with Limbach because it was double-breasted, naming Harper as the non-union employer. Though he claimed that the local would not retaliate against those who continued to work for Limbach, he advised members to read the constitution and bylaws of the International, and referred them to provisions of the constitution and bylaws that imposed penalties on members who "accept[ ] employment in any shop or on any job ... or perform[ ] any work covered by the claimed jurisdiction of [the unions]. . . . for any employer that is not signatory to or bound by a collective bargaining agreement with an affiliated local union. . . . "

On June 14, Limbach employees received from Local 80 a letter stating that the union regarded Limbach as a non-union employer and intended to "treat Limbach as exactly that." The letter again referred employees to the International constitution. The afternoon after receiving the letter, all Limbach employees walked off Limbach's job sites and neither returned nor sought to work for Limbach thereafter.

As a result of the loss of its workforce, Limbach was put out of the sheet metal business at 35 area job sites where work was required to be performed by an employer signatory to a collective bargaining agreement and was unable to bid on other contracts that could be performed with non-union employees, as that would have subjected it to potential withdrawal liability from the union pension fund.

### B. *The Administrative Proceedings*

Limbach filed unfair labor practice charges against the union on March 10, 1988, alleging that the union had committed unlawful secondary boycott activity under § 8(b)(4)(i) and (ii) of the Act by striking and coercion. On June 2, 1988, the Board issued a complaint on Limbach's charges. The Administrative Law Judge ("ALJ") on June 5, 1989, recommended that the complaint be dismissed in its entirety on his finding that the refusal to enter a successor § 8(f) pre-hire collective bargaining agreement did not constitute strike activity and that the inducement and encouragement of Limbach's union employees to find employment elsewhere was primary rather than secondary in nature, and thus not within the purview of § (ii)(B).

The general counsel filed exceptions. On September 30, 1991, the Board reversed the ALJ's decision as to both charges, finding that Limbach and Harper were separate employers and concluding that because Limbach was a "neutral" involved in a "primary labor dispute" between the union and Harper Mechanical, the union's inducement of Limbach's employees to leave constituted a strike for an illegal object. The Board further held that Local 80's refusal to negotiate a successor § 8(f) agreement on the expiration of the old one was designed to coerce the employer to cease doing business with Harper in order "to force the unionization of Harper," and constituted a violation of § (ii)(B).

The Board then issued a remedial order directing the unions to "cease and desist and to rescind their disclaimers." The union has petitioned for review, and the Board for enforcement.

## II.  ANALYSIS

### A.  *The § 10(b) Question*

■ As a threshold matter, the union claims that the Board relied entirely on events occurring between 1983 and 1986 to support its finding that the union's actions were undertaken for an object proscribed in subsection B of § 8(b)(4), in violation of the Act's six-month statute of limitations. *See* § 10(b) of the Act, 29 U.S.C. § 160(b) (1988).  Most of the critical evidence establishing the motivation of the union's action took place more than six months before the union's refusal to renew the prehire agreement;  standing alone, it would be time barred.

However, it is well established that evidence of "earlier events may be utilized to shed light on the true character of matters occurring within the limitations period" when "occurrences within the six-month limitations period in and of themselves may constitute, as a substantive matter, unfair labor practices."  *Machinists Local v. NLRB,* 362 U.S. 411, 416, 80 S.Ct. 822, 826, 4 L.Ed.2d 832 (1960).  In the instant case, the Board permissibly relied on earlier events to explain the union's statement in 1988 that it was severing its bargaining relationship with a "double-breasted" employer.

Furthermore, because the union never disavowed its "100% union or 100% non-union" policy and offered no other credible explanations for its actions in 1988, the Board reasonably could infer that the union's objective had remained constant. Where there is no "intervening change in circumstances to undermine the Board's inference that the objective manifested by th[e] antecedent conduct continued unchanged," otherwise time-barred evidence may properly be taken into account. *Sheet Metal Workers' Int'l Ass'n v. NLRB,* 293 F.2d 141, 147 (D.C.Cir.), *cert. denied,* 368 U.S. 896, 82 S.Ct. 172, 7 L.Ed.2d 92 (1961); *accord Rikal, Inc. v. NLRB,* 721 F.2d 402, 405 (1st Cir.1983); *NLRB v. International Union of Operating Eng'rs,* 624 F.2d 846, 850 (8th Cir.1980).

Therefore, the Board did not err by considering as evidence actions that occurred more than six months before a formal complaint was filed before it.

### B.  *The Section 8(b)(4) Claims*

Section 8(b)(4) of the Act makes it an unfair labor practice for a union to engage in "secondary boycott" activity.  That is, it seeks to prohibit unions from bringing pressure to bear against employers with whom they have no labor dispute ("secondary" or "neutral" employers) with the object of forcing those neutral employers to cease doing business with a third-party employer with which the union has a labor dispute.  Restrictions on "secondary boycotts" embodied in the Act implement "dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures and controversies not their own."  *NLRB v. Denver Bldg. and Const. Trades Council,* 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951).

In this case the Board found that the union had committed unfair labor practices in violation of two subsections, § 8(b)(4)(i) and § (ii)(B).  The first of those subsections makes it an unfair labor practice for a union to induce or encourage employees to strike with an object of forcing that employer to cease doing business with another employer or to force the other employer to recognize the union.  The second subsection makes it an unfair labor practice for a union to threaten or coerce an employer for the same unlawful purpose.  We will discuss each in turn.

#### 1.  *Section 8(b)(4)(i)*

■ The union argues that the Board erred in interpreting Limbach's employees' action when they walked off the job on June 14 as a "strike" within the meaning of § 8(b)(4)(i), rather than as a final cessation of employment.  We agree.

The Labor Management Relations Act of 1947 defines a strike to include "any strike or other concerted stoppage of work by employees (including a stoppage by reason

of the expiration of a collective bargaining agreement) and any concerted slowdown or other concerted interruption of operations by employees." Labor Management Relations Act of 1947, § 501(2), 29 U.S.C. § 142(2) (1988). Similarly, the Third Circuit has said a "strike" is generally understood to "mean a cessation of work by employees, accompanied by picket lines which in combination impair or prevent production in all of the employer's premises." *Jones & Laughlin Steel Corp. v. United Mine Workers*, 519 F.2d 1155, 1158 (3rd Cir. 1975).

Over the years, along with peaceful demonstrations, strikes have included activities such as "mass picketing, threatening employees desiring to work with physical injury or property damage, obstructing entrance to and egress from the company's factory, obstructing the streets and public roads surrounding the factory, and picketing the homes of employees." *Allen–Bradley Local 1111 v. Wisconsin Employment Relations Bd.*, 315 U.S. 740, 748, 62 S.Ct. 820, 825, 86 L.Ed. 1154 (1942). However, it is well established that concerted employee resignations do not constitute a strike when the employees intend to obtain employment elsewhere; for a strike to exist, the employees' objective must be to resume work on terms acceptable to them and agreed on by the employer. *See* THE DEVELOPING LABOR LAW Vol. II 1088 (Patrick Hardin, ed., 3d ed. 1992).

There is no evidence indicating that any of the union members who resigned from Limbach's Detroit division on June 14, 1988 did *not* intend to sever permanently his employment status. Rather, the uncontroverted facts suggest that the union members employed by Limbach did in fact quit. All found permanent positions elsewhere, none subsequently returned or attempted to return to work for Limbach. Limbach management never expected any such return by employees, and neither Local 80 nor the International ever contacted Limbach management about terms or conditions under which employees would return to work. In addition, the former Limbach employees did not engage in any disruptive self-help tactics, such as picketing, which

are the hallmark of traditional strike activity.

■ On these facts, we cannot conclude that a strike occurred within the meaning of § 8(b)(4)(i). *See Limbach Co. v. Sheet Metal Workers Int'l Ass'n*, 949 F.2d 1211, 1221 (3rd Cir.1991), *aff'd on rehearing en banc*, 949 F.2d 1241 (1991). Voluntary quitting by an individual employee or by a group of employees through mass action is not strike action within the meaning of § 8(b)(4)(i). *See LTV Electrosystems, Inc. v. NLRB*, 408 F.2d 1122, 1127 (4th Cir. 1969); *United States v. International Longshoremen's Ass'n*, 337 F.Supp. 381 (S.D.N.Y.1971); *United States v. AVCO Corp.*, 270 F.Supp. 665, 669 (D.C.Conn. 1967); *United States v. National Maritime Union*, 196 F.Supp. 374, 382–83 (S.D.N.Y.1961); *Penello v. International Union, United Mine Workers*, 88 F.Supp. 935, 941 (D.D.C.1950).

Therefore, the Board's finding that the unions induced or encouraged Limbach's employees to strike is unsupported by substantial evidence. We reverse its determination that the unions' activities violated § 8(b)(4)(i) of the NLRA.

### 2. The Section 8(b)(4)(ii)(B) Claim

■ The Board concluded that the union had engaged in secondary economic coercion prohibited by § 8(b)(4)(ii)(B) of the Act when it terminated its collective bargaining relationship with Limbach and disclaimed interest in representing Limbach's employees, in order to force Limbach to end its business relationship with Harper, or to coerce Limbach to force Harper to recognize and bargain with a local union.

■ This Circuit has noted that, "It is well established that the otherwise lawful exercise of rights afforded by a collective bargaining agreement can become unlawful when aimed at securing an objective proscribed by section 8(b)(4)." *Sheet Metal Workers, Local Union No. 91 v. NLRB*, 905 F.2d 417, 424 (D.C.Cir.1990). Termination of a bargaining relationship for the purpose of applying economic coercion to achieve a secondary objective constitutes

just such an unlawful objective. *Limbach Co. v. Sheet Metal Workers Int'l Ass'n,* 949 F.2d 1241, 1256 (3rd Cir.1991); *Gottfried v. Sheet Metal Workers Int'l Ass'n, Local 80,* 876 F.2d 1245, 1250–51 & n. 1 (6th Cir.1989).

The union, however, contends that "[m]otive ... is beside the point.... [E]ither party at contract expiration time, for good reasons or bad reasons, or for no reasons at all, has the statutory right to decline to negotiate a successor [pre-hire] agreement." Petitioner's Brief at 30 (emphasis omitted). This assertion is a misstatement of the law, resulting from an erroneous interpretation of *Deklewa,* 282 N.L.R.B. 1375 (1987), *enforced sub nom. International Ass'n of Bridge, Structural & Ornamental Iron Workers, Local 3 v. NLRB,* 843 F.2d 770 (3rd Cir.), *cert. denied,* 488 U.S. 889, 109 S.Ct. 222, 102 L.Ed.2d 213 (1988).

In *Deklewa,* the Board held that parties to an 8(f) agreement are not constrained to abide by the same rules concerning good-faith bargaining that would apply under §§ 8(a)(5) and 8(b)(3), 29 U.S.C. §§ 158(a)(5) and (b)(3), of the Act, had their bargaining relationship been entered into under § 9 of the Act, 29 U.S.C. § 159. 282 N.L.R.B. at 1387–88. This does *not* mean, as the union argues, that it was "categorically entitled to refuse with impunity to negotiate a successor contract with Limbach." Petitioner's Brief at 31 (emphasis omitted). As the Board noted here, *Deklewa* merely stands for the principle that "an 8(f) union may repudiate its bargaining relationship at the expiration of the agreement without violating Section 8(b)(3). It does not mean that such a disclaimer cannot violate Section 8(b)(4)(B) if it is made for an unlawful secondary purpose." *Sheet Metal Workers, Local Union 80,* 305 N.L.R.B. No. 36 (Sept. 30, 1991) (emphasis omitted). *See also Sheet Metal Workers, Local Union No. 91 v. NLRB,* 905 F.2d 417, 424 (D.C.Cir.1990).

The union no longer contests the Board's finding that Limbach and Harper are "separate persons" for purposes of § 8(b)(4)(B) of the Act, and therefore that Limbach was a neutral with respect to the union's primary dispute with Harper. Petitioner's Brief at 7, n. 1. Furthermore, it is undisputed that Local 80, acting at the direction of the International, threatened to, and did, terminate its collective bargaining relationship with Limbach and disclaim interest in representing Limbach employees. Therefore, the only question left for us is whether the Board erred in its determination that the unions acted with the intent to coerce the Limbach corporate group either to unionize Harper or sell it.

■ We make this review under a deferential standard. The Board's findings are conclusive if they are supported by substantial evidence and we give "substantial deference to inferences drawn from the facts." *Avecor, Inc. v. NLRB,* 931 F.2d 924, 928 (D.C.Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 912, 116 L.Ed.2d 812 (1992). It is unnecessary to recount every fact supporting the Board's decision, and it is quite clear that ample evidence supports the Board's holding that the union's objective was to coerce the neutral Limbach to sever relations with Harper or force the third-party Harper to sign a union contract. For example, Carlough, the International Union's president, repeatedly urged Walter Limbach to see that Harper entered into a collective bargaining agreement, threatening "labor troubles" if his demands were refused. The International subsequently indicated that locals under contract with Limbach would file grievances and stated that if those grievances failed, it would require the locals both to disclaim interest in representing Limbach employees and to refuse to bargain with Limbach for renewal contracts. The International subsequently articulated a policy designed to require signatory employers to ensure either that all affiliates were unionized or that they divest themselves of any financial relationship with non-union affiliates. Finally, the Local 80 business manager testified that had Harper gone union, he would have given "serious consideration" to renewing Local 80's bargaining relationship with Limbach.

The union, by its own admission, objected to Limbach's affiliation with Harper and Harper's non-union status. Because the union can point to no primary dispute motivating its conduct; its actions were designed to influence the labor policies of Harper, a separate employer; and it exerted pressure on Limbach to effectuate its goals, substantial evidence supports the Board's finding of a violation of § 8(b)(4)(ii).

## CONCLUSION

Because the mass quitting by the union workforce did not constitute a strike within the meaning of § 8(b)(4)(i), we reverse the Board's holding that the unions unlawfully induced and encouraged Limbach's employees to cease work in violation of § 8(b)(4)(i)(B) of the National Labor Relations Act. As to the union's disclaimer of interest in representing Limbach's employees and its termination of the bargaining relationship with Limbach, however, that behavior constituted an unfair labor practice under § 8(b)(4)(ii), as it was committed for the unlawful purpose of secondary coercion. Although critical evidence of the motivation for the union's actions occurred over six months before the union's refusal to renew the agreement, and thus technically exceeded the limitation period established by § 10(b), that evidence was admissible to establish that the union's subsequent actions were in fact illegal. Accordingly, we affirm the Board's finding that the union violated § 8(b)(4)(ii)(B) of the National Labor Relations Act.

*It is so ordered.*