**Opinions of the United States Court of Appeals for the Third Circuit**



5-1-2001

# Taylor Milk Co v. International Brotherhood Teamsters

Precedential or Non-Precedential:

Docket 00-1598

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Taylor Milk Co v. International Brotherhood Teamsters" (2001). *2001 Decisions.* Paper 95.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/95

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 1, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NOS. 00-1598 and 00-1616

TAYLOR MILK COMPANY, a Pennsylvania Corporation,
Appellant in No. 00-1598

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS,
AFL-CIO, an unincorporated association and labor
organization; INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, DAIRY CONFERENCE - USA AND CANADA,
an unincorporated association and labor organization;
SERVICE PERSONNEL AND EMPLOYEES OF THE DAIRY
INDUSTRY TEAMSTERS LOCAL UNION NO. 205, an
unincorporated association and labor organization

TAYLOR MILK COMPANY, a Pennsylvania Corporation

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS,
AFL-CIO, an unincorporated association and labor
organization; INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, DAIRY CONFERENCE - USA AND CANADA,
an unincorporated association and labor organization;
SERVICE PERSONNEL AND EMPLOYEES OF THE DAIRY
INDUSTRY TEAMSTERS LOCAL UNION NO. 205, an
unincorporated association and labor organization

       International Brotherhood of Teamsters, AFL-CIO;
       International Brotherhood of Teamsters, Dairy
       Conference-USA and Canada,
       Appellants in No. 00-1616

On Appeal From the United States District Court
For the Western District of Pennsylvania
(D.C. Civil Action No. 95-cv-01663)
District Judge: Honorable D. Brooks Smith

Argued February 8, 2001

BEFORE: SCIRICA, MCKEE and STAPLETON,
Circuit Judges

(Opinion Filed May 1, 2001)

        David J. Armstrong
        Dickie, McCamey & Chilcote
        Two PPG Place, Suite 400
        Pittsburgh, PA 15222
         and
        John A. McCreary, Jr. (Argued)
        Babst, Calland, Clements & Zomnir
        Two Gateway Center, 8th Floor
        Pittsburgh, PA 15222
         Attorneys for Appellant/Cross
        Appellee

        Ernest B. Orsatti (Argued)
        Jubelirer, Pass & Intrieri
        219 Fort Pitt Boulevard
        Pittsburgh, PA 15222
         Attorney for Appellees/Cross
        Appellants

OPINION OF THE COURT

STAPLETON, Circuit Judge:

Taylor Milk Company ("TMC") brought suit against the
International Brotherhood of T eamsters ("IBT"), the IBT
Dairy Conference of the USA and Canada ("Dairy
Conference"), and its own IBT Local Union No. 205 ("Local
205") (collectively "IBT") for unfair labor practices in

violation of 29 U.S.C. S 187. TMC alleged that appellees violated the prohibition against secondary boycotts by coercing a neutral party into not doing business with TMC. The District Court found that the appellees had committed such unfair labor practices and awarded TMC damages in the amount of $50,000. TMC appeals this damage awar d as too low. IBT cross-appeals the District Court's denial of summary judgment and determination of liability.

I.

TMC was located outside of Pittsburgh in Ambridge, Pennsylvania.1 In 1995, TMC was operating at a net loss caused by meeting the demands of a customer base that exceeded the processing and delivery capacities of the Ambridge facility. During this same time, Bor den, Inc., the well-known national dairy company, had deter mined that it would abandon the fluid milk business east of the Mississippi River. Borden operated afluid milk plant in Youngstown, Ohio, which is about an hour's drive northwest of Ambridge. The Borden plant had an insufficient customer base and was slated to be sold.

In August of 1995, TMC entered into negotiations to purchase this plant from Borden. TMC paid Borden $50,000 in order to gain the exclusive right to purchase the facility. Joseph Taylor, the pr esident of TMC, hoped that by shifting production operations to Borden's Youngstown plant, TMC would be able to turn a profit. The Borden Youngstown facility was generally a superior facility from an operational standpoint and the wages paid to the Youngstown production workers wer e significantly less than those paid to the workers in Ambridge. TMC planned to eliminate the Ambridge production jobs after acquiring the Youngstown facility but to keep the Ambridge plant as a distribution facility.

The stipulated purchase price for the Y oungstown facility was approximately $1,200,000. The finalization of the agreement, however, was dependent upon TMC first obtaining bank financing for the deal. The bankfinancing

---

1. TMC has now ceased operations.

was in turn contingent upon the existence of a stable, long-term collective bargaining agreement ("CBA") between Borden and its labor force, which TMC would then assume.

Toward its goal of forming such an agreement, TMC traveled to Youngstown to meet with the Borden's Youngstown employees, represented by Teamsters Local 377 ("Local 377"), and Eben Byers, the union's business agent. TMC proposed a new CBA with moderate increases in wages and benefits. Local 377 seemed responsive to these proposals, though Byers noted that since Borden was the employer of Local 377, any current agreement needed to be negotiated with Borden rather than TMC. Byers understandably hoped that some agreement could be worked out with TMC so that Local 377's members could remain employed following Borden's sale of the Youngstown facility.

On August 25, 1995, representatives from Local 205 and TMC met at a hotel. Local 205 was represented by its principal officer, William Lickert. Local 205 had somehow become aware of TMC's plans to shift production jobs to Youngstown and terminate workers at Local 205. Local 205 had invited the Chairman of the Teamster's Dairy Conference, Fred Gregare, to the meeting in order to negotiate in its interest and preserve the jobs of workers at Local 205.

The facts of the meeting are in dispute, but it is clear that there were strong words exchanged. Joseph Taylor began the meeting by announcing TMC's intentions to relocate production jobs. William Lickert responded by waving a copy of the union's CBA and stating that Local 205 had the contractual right to "follow its work" to the Youngstown facility.

Lickert asserted that a no-subcontracting clause in the CBA prevented TMC from implementing its plan to shift production to Youngstown. The CBA specified that "all dairy products . . . shall be manufactured, processed, packaged and/or handled by the Employer's employees .. . . No work or services presently performed or hereafter assigned to the collective bargaining unit . . . will be subcontracted . . . ." (emphasis added). TMC maintains that this provision was

4

not dispositive of the plan, since Local 205 would still "handle" the products which were manufactured in Ambridge and an exception clause excluded ice cream and some other products from the scope of this provision.

Discussions deteriorated further. Gregare, chairman of the Teamster's Dairy Conference, then stated that he was "implementing Article 12, Section 2" of the Teamster Constitution and "giving jurisdiction of the Borden Youngstown plant to Local 205." (The parties now agree that section 2 of Article 12 conferred no such authority.) Gregare instructed Borden to sell the plant to someone else.[2] The meeting ended soon thereafter.

Gregare sent follow-up letters to Borden's Local 377 stating that section 2 of Article 12 of the Teamster's Constitution was being implemented. Gregare further stated that he was requesting in accordance with section 2 of Article 12 that prior approval be granted before Local 377 ratified any collective bargaining agreement. Gregare then contacted Byers directly by telephone and told Byers not to re-negotiate the Local 377–Borden contract but to listen to any proposals and fax them to Gregare. At trial, Gregare admitted that he had no authority to require Byers to obtain his approval before re-negotiating a contract. The District Court found that Byers complied with this directive out of fear that Local 377 would be placed in trusteeship if Byers disobeyed Gregare's orders.

On September 1, Borden offered a CBA proposal to Local 377 that Byers considered "ridiculous" but that would have normally served as the basis for a counter-proposal from Local 377. Per Gregare's instructions, Byers forwarded the proposal to Gregare and did not respond to the offer. Local 377 instead sent a letter to Gregare's superiors asking whether Gregare truly had authority to negotiate on behalf of Local 377 and requesting permission to proceed with negotiations. No response was received.

On September 15, Borden again met with Byers and

---

2. At trial, Gregare denied invoking Article 12, Section 2, denied awarding jurisdiction to Local 205, and denied telling Borden to sell its plant to someone else. The trial court credited none of these denials.

informed Byers that Borden would have to close the plant. Byers continued to follow Gregare's instructions not to negotiate. Borden concluded that dealing with Byers was not effective and that Borden would have to deal with Gregare directly. On October 2, Bor den met with Gregare on Gregare's home base in Wisconsin. Byers was present for "a very short meeting," but was then excluded from negotiations, which were conducted only by Gr egare and Borden. When negotiations were finished, Gregare informed Byers that a counter-proposal had been made, that the counter-proposal had been rejected, and that the plant would close. Byers expressed a desire to continue negotiations but Gregare refused to negotiate further. Consequently, the deal between TMC and Borden fell through and the Youngstown plant was closed. All Local 377 employees at the Youngstown facility wer e terminated.

TMC filed suit against IBT under the Labor Management Relations Act ("LMRA"), 29 U.S.C. S 187(a), seeking damages for an alleged violation of the secondary boycott provisions codified at 29 U.S.C. S 158(b)(4). The District Court bifurcated the damage and liability trials. The trial court found that the defendants were liable for violating 29 U.S.C. S 158(b)(4) and entered judgment for TMC in the amount of $50,000 plus prejudgment inter est. TMC appeals the damages verdict, alleging that it was entitled to a larger damages award. IBT cross-appeals the liability verdict, asserting that 29 U.S.C. S 158(b)(4) was never violated.

The District Court had jurisdiction over this case pursuant to 29 U.S.C. S 187 and 28 U.S.C.S 1331. Our appellate jurisdiction is pursuant to 28 U.S.C.S 1291. Factual findings of the District Court are r eviewed for clear error. Sheet Metal Workers Local 19 v. 2300 Group, 949 F.2d 1274, 1278 (3d Cir. 1991). The District Court's application of legal precepts is subject to plenary review. Holmes v. Millcreek Tp. Sch. Dist., 205 F .3d 583, 589 (3d Cir. 2000).

II.

1. Liability

Local 205 and IBT state that they did not violate 29 U.S.C. S 158(b)(4)(ii)(B), and that the District Court erred by

concluding that they did so. That statute pr ovides, in applicable part:

> (b) Unfair labor practices by labor or ganization. It shall be an unfair labor practice for a labor organization or its agents--

> (4) . . . . (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry af fecting commerce, where . . . an object ther eof is--

> . . . .

> (B) forcing or requiring any person . .. to cease doing business with any other person, . . . Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

29 U.S.C. S 158(b)(4).

We have summarized the purpose of the secondary boycott provision in our opinion in Limbach Co. v. Sheet Metal Workers Int'l Ass'n, 949 F.2d 1241, 1249–50 (3d Cir. 1991).

> Section 8(b)(4)(ii) of the NLRA prohibiting secondary boycotts by unions essentially prohibits union conduct designed to force a primary employer (the employer with which the union has a dispute) to bargain with a union or to force a neutral employer (an employer with which the union has no dispute) to cease doing business with the primary employer. The pr oscribed methods used to achieve the objectives include threatening, coercing, or restraining the secondary employer. See, e.g., Soft Drink Workers Union Local 812 v. NLRB, 212 App. D.C. 10, 657 F.2d 1252 (D.C. Cir. 1980). Coercion can include economic pr essure upon the neutral party. Allentown Racquetball & Health Club, Inc. v. Building and Constr. Trades Council of Lehigh and Northampton Counties, 525 F. Supp. 156 (E.D. Pa. 1981). The purpose of the prohibition against secondary boycotts is to shield unoffending employers from pressures in disputes not their own, though preserving the rights of unions to bring pr essure to bear on offending employers in primary labor disputes.

7

Anderson v. International Bhd. of Elec. W orkers, Local No. 712, AFL–CIO, 422 F. Supp. 1379 (W .D. Pa. 1976).

Id.

The District Court found that IBT violated this section when Gregare, representing the interests of Local 205, usurped Local 377's place in negotiations to pr event Borden from continuing negotiations with TMC. The District Court concluded that Borden was a neutral thir d party and that Gregare's actions, in preventing negotiations between Local 377 and Borden, forced Borden to cease doing business with TMC. IBT argues that this was an err oneous decision for a number of reasons.

First, IBT suggests that because Local 377 was within its rights in "following Gregare's advice" and deciding not to negotiate with Borden, there was no unlawful activity. This ignores the Limbach rule that we look to the intention of the parties in coercing neutral parties, not to the general rights of parties to take particular actions. See id. , 949 F.2d at 1252–53 (stating that the exercise of legitimate rights may be unlawful if exercised "for the purpose of applying economic coercion to achieve a prohibited secondary objective"). IBT suggests that Gregar e was operating in the best interest of Local 377 in rejecting its offer, but this is contrary to the facts found by the District Court. The District Court found that Gregare was not operating in the interests of Local 377, but was instead inter fering in the negotiations between Local 377 and Borden towar ds the end of preventing Borden from continuing in its business negotiations with TMC. This determination has adequate support in the record.

Second, IBT suggests that Gregare could not have exerted coercive economic influence on Borden because Borden never intended to negotiate an agreement with Local 377. For the same reason, IBT suggests that it was not the proximate cause of any damages, since Bor den would not have sold the facility to TMC. Again, there is no clear error in the District Court's determination that this was not the case. The District Court credited the testimony of Byers that Borden's initial offer did not indicate an unwillingness to negotiate but instead constituted an initial"wish–list"

8

which, through the process of negotiation, could have led to more reasonable terms.

Third, IBT suggests that the District Court err ed by concluding that Borden was a neutral party because Borden was operating as the alter-ego of TMC. Therefore, IBT argues, any coercive pressur e applied against Borden was legitimate, since it was directed against TMC, not Borden. The test of whether two employers constitute a "single entity" under the secondary boycott pr ovisions of the LMRA is based on: (1) common ownership; (2) common management; (3) centralized control of labor r elations; and (4) interrelationship of operations. Boich Mining Co. v. NLRB, 955 F.2d 431, 434 (6th Cir. 1992). The District Court did not err by concluding that Borden and TMC were not a "single entity" under this test.

Insofar as Local 205 is merely suggesting that it was in TMC's interest that Borden obtain a CBA with Local 377, it is also true that successful negotiations wer e in Borden's interest as well. Just because the inter ests of TMC and Borden were aligned does not mean that Bor den and TMC were the same entity for the purposes of the LMRA's secondary boycott provisions. It is axiomatic that business relationships exist in those cases wher e such relationships operate to the mutual benefit of parties.

Fourth, IBT suggests that Borden was not "doing business" with TMC because this was a case involving the sale of a single asset. This is relevant because if TMC and Borden were not doing business, it would be impossible for IBT to have coerced them to cease doing business in violation of 29 U.S.C. S 158(b)(4)(ii)(B). IBT cites Amax Coal Co. v. NLRB, 614 F.2d 872, 885-86 (3d Cir . 1980), where this Court stated:

> The phrase "doing business" refers to a continuing business relationship which is capable of being discontinued by one employer in order to for ce another employer to accede to union demands. Thus, as noted earlier, Section 8(e) was designed to pr otect neutral employers and their employees, not involved in a labor dispute, from being pressured to assist a union in a dispute with another employer.

In Amax, a union sought to bind its primary employer to a commitment that any successor to the operation would abide by the terms of the current bar gaining agreement. This Court held such proposed successorship arrangements do not constitute interference in "doing business." The Court also held in the alternative that "even if the conveyance of a portion of Amax's coal mining operations . . . constituted `doing business' " the fact that the employees of both businesses were identical made this a primary rather than secondary boycott. Id. at 886.

The District Court concluded that Amax did not apply to this case because a trademark licensing provision in the proposed contract of sale between Borden and TMC envisioned a continuing business relationship over several years. IBT challenges this conclusion. It str essed that it had no knowledge of the proposed trademark licensing agreement and that, therefore, it could not have had as its "object" the disruption of such a business r elationship. 29 U.S.C. S 158(b)(4)(ii). This point is well-taken. Because no finding was made below that IBT was aware of the trademark licensing provision, we cannot affirm the District Court's decision on this basis.

We conclude, however, that the District Court's decision on this issue can be affirmed on the alter native ground that a continuing long-term negotiation over the purchase of a new asset from a neutral party meets the "doing business" requirements of 29 U.S.C. S 158(b)(4). As we stated in Limbach, the secondary boycott provisions are directed at preventing a union from leveraging a neutral third party's relationship with a primary employer in or der to force the primary employer to accede to the union's demands. Limbach, 949 F.2d 1249-50. This clearly happened in the present case. Gregare disrupted Bor den's negotiations with Local 377 with the objective of preventing TMC from negotiating to purchase the Borden facility. Gregare's ultimate goal was to prevent TMC from cutting Local 205's production jobs at Ambridge.

Amax, upon which IBT relies, is not helpful here. In Amax, no third party had yet appear ed on the scene. Therefore, in Amax, no neutral party could be leveraged in order to aid the union in its primary dispute. Here a third

10

party did exist and was indeed successfully leveraged to allow IBT to achieve its primary objective. Accor dingly, we will affirm the District Court's decision on the issue of liability.

2. Damages

TMC alleges that it was damaged to the extent that it lost the benefit of purchasing the Youngstown facility. TMC claims that had it purchased the Borden facility and cut production jobs at Ambridge, it would have made a profit from the resulting synergies. While the District Court characterized the exact calculations of Joseph T aylor and TMC's expert witnesses as "rosy," it apparently accepted that some profits would have been likely to r esult from this plan, dubbed "Plan A" by Taylor. Plan A, however, was based on the premise that the CBA between Local 205 and TMC would be interpreted at arbitration to per mit milk production jobs to be moved to Youngstown.

Joseph Taylor testified that even if the CBA had been interpreted in favor of Local 205, he would have still purchased the Youngstown facility. T aylor had two contingency plans based on this eventuality, and Joseph Taylor testified some profits would have occurred under these two contingency plans (dubbed "Plan B" and "Plan C").

Damages here are claimed pursuant to 29 U.S.C. S 187(b). That statute states:

> Whoever shall be injured in his business or pr operty by reason [of] any violation of subsection (a) may sue therefor in any district court of the United States subject to the limitations and provisions of [29 U.S.C. S 185] without respect to the amount in controversy, . . . and shall recover the damages by him sustained and the cost of the suit.

It is axiomatic that in the typical case "plaintiff bears the burden of proving every element of his case, including damages." Rochez Bros. v. Rhoades, 527 F.2d 891, 894 (3d Cir. 1975). Violations of 29 U.S.C.S 158(b)(4)(ii) sound in tort, and are in the nature of inter ference with advantageous economic relations. Allied Int'l v. International

11

Longshoreman's Ass'n, 814 F.2d 32, 40 (1st Cir. 1987). The statute here, 29 U.S.C. S 187(b), r equires proof of injury "by reason" of an unfair labor practice. These two words must be read as requiring that TMC prove some causal nexus between IBT's activities and an injury TMC has suf fered. Tresca Bros. Sand & Gravel v. T ruck Driver's Union, Local 170, 19 F.3d 63, 65 (1st Cir. 1994); Feather v. UMW & Dist. 2, 711 F.2d 530, 538 (3d Cir. 1983).

TMC points out, correctly, that if it has pr oven that some damage occurred, a District Court is per mitted to award an amount of damages that is "to some extent impr ecise." Scully v. US Wats, Inc., 238 F.3d 497, 515 (3d Cir. 2001). All that is required is that sufficient facts be introduced for a court to arrive at an intelligent estimate without speculation or conjecture. Id. "[T]he law does not command mathematical preciseness from the evidence in finding damages. . . ." Rochez, 527 F.2d at 895.

Although the District Court did characterize TMC's damages claim as speculative, TMC mistakenly attributes the District Court's uncertainty to an inability tofix a precise amount of damages. Rather, the District Court was skeptical as to whether TMC had suffer ed damages at all, making the cases cited by TMC inapplicable. See Kemmerer v. ICI Ams., Inc., 70 F.3d 281, 290 (3d Cir. 1995) (finding that where "the very existence of damages" is in dispute, equitable principles do not compel a damages awar d); Blanche Road Corporation v. Bensalem Township , 57 F.3d 253, 265 (3d Cir. 1995).

Our review of the record reveals that the District Court did not commit clear error insofar as it found that TMC had failed to prove the profitability of Plan B and Plan C. TMC was, however, entitled to a determination of whether it could have implemented Plan A. If it was likely that Plan A would have been successfully implemented, TMC would presumably have suffered some damages. To determine if Plan A could be implemented, the District Court was required to examine all the evidence befor e it, including the text of the CBA.

It is not clear that the District Court made such an examination. Instead, the District Court declar ed that it

would be usurping the role of the arbitrators if it interpreted the relevant portion of the CBA. The District Court then relied on the following testimony of TMC's labor counsel:

> If the whole thing hinged just on winning that arbitration, if it was a gamble, throwing the dice or the turn of the cards, on that alone, it would have been chancie [sic] at best under the circumstances at which we would have gone to the arbitration table. The language was definitely in favor of Taylor Milk's position. The "otherwise handled" language. However, there were no attorneys permitted unless both sides agreed. There were named arbitrators. And I believe had we had ad hoc arbitration with attorneys present, we would have had an excellent chance of winning. Under the burden under which we labored under that contract, I think it would have been a good possibility of winning, but it would not have been a sur e thing by any means.

Apparently, based upon the attorney's opinion that the arbitration would be chancy and that there would have been "a good possibility" of winning, the District Court concluded that TMC had "proved only that it had some possibility of winning an arbitration but not that a victory was assured or even likely." We find two legal errors in the District Court's analysis.

First, because TMC was entitled to prove damages, the District Court was required to deter mine whether it was more likely than not that TMC would have won the arbitration. The District Court could not have done this without considering the disputed text of the CBA. The District Court erred insofar as it concluded that it was precluded from considering the CBA because the parties had agreed to arbitrate and it was not pr oper for the District Court to opine as to the outcome of arbitration. To the contrary, it is not uncommon for a District Court to be called upon to determine what the result of a dispute resolution process would have been if one party had not forgone the opportunity to seek arbitration. 3

_____

3. TMC was required by law to establish by a preponderance of the evidence that it would have suffered damages. Given the District Court's

13

Second, we conclude the District Court erred insofar it relied exclusively on the testimony of TMC's counsel to conclude that TMC was not likely to prevail. In fact, the testimony was consistent with the proposition that an arbitration victory for TMC was more likely than not. Although TMC's counsel did suggest that arbitration was chancy, he later stated that TMC had a "good possibility of winning." We do not see how these r emarks, taken as a whole, can be interpreted as suggesting that it was unlikely that TMC would have prevailed at arbitration.

We also note that the District Court awar ded $50,000 to TMC in damages. This amount is equal to the amount paid by TMC to Borden for the exclusive right to pur chase the Youngstown plant. At the same time, the District Court denied TMC $162,000 in out-of-pocket expenses associated with TMC's efforts to purchase the facility. Both parties are correct in arguing that this awar d was erroneous as it appears internally inconsistent to awar d one sunk cost associated with TMC's right to purchase the Bor den facility yet deny other sunk costs related to the same transaction.

In the interest of administrative economy, we will clarify what we feel to be the correct legal analysis in relation to these expenses. If, upon remand, the District Court determines that TMC would not have prevailed at arbitration and maintains its determination that Plans B and C would not have been profitable, it is clear that TMC could have suffered no damage from IBT's actions, as the loss of TMC's right to purchase the Bor den plant would have placed it in no worse of an economic position than if it had purchased the plant. In other wor ds, If TMC could not have profited from purchasing the Borden plant, there

_____

determination that TMC did not carry its bur den of proving the feasibility of Plans B and C, TMC was requir ed to prove it would have prevailed in the arbitration in order to prove damages. Only if Plan A was feasible could TMC have suffered fr om the loss of the ability to implement plan A. Thus, some analysis of the likely outcome of arbitration was required. Local 205 was the only defendant that could have required arbitration of this issue and its failure to do so should not
operate to the detriment of TMC.

14

can be no basis for awarding TMC damages.4 If, on the other hand, TMC can prove to the District Court's satisfaction that it would have consummated Plan A and made a profit, then the exclusive pur chase option and the out-of-pocket expenses associated with that pur chase cannot be directly recovered. Instead, they should be factored as expenses counted against any calculation of future profits.

III.

For the above reasons, we will reverse the District Court's judgment and remand this matter to the District Court for further proceedings consistent with this opinion.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

_____

4. The District Court characterized the $50,000 as money which TMC "indisputably lost." Though this is true, the statute is explicitly limited
to losses which occur by reason of the defendant's unfair labor practices. Even had IBT not violated the law, TMC would never have recovered the cost of its purchase option. Plaintiff 's characterization of this award as
"restitution" is both novel and err oneous. A theory of restitution could not justify such an award, as IBT was never unjustly enriched by TMC's payment. See ATACS Corp. v. Trans World Communs., 155 F.3d 659, 669 (3d Cir. 1998) ("Accordingly, restitution damages will require the party in
breach to disgorge the benefit received by returning it to the partywho conferred it.").

15