# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-2848
No. 11-3115

_____

| | | |
|---|---|---|
| Laborers District Council of Minnesota and North Dakota, | * * * | |
| Petitioner/Cross Respondent, | * * | Petition for Review of an Order of the National |
| v. | * * | Labor Relations Board. |
| National Labor Relations Board, | * * * | |
| Respondent/Cross Petitioner. | * | |

_____

Submitted: May 16, 2012
Filed: August 7, 2012

_____

Before WOLLMAN, BEAM, and LOKEN, Circuit Judges.

_____

LOKEN, Circuit Judge.

The Laborers District Council of Minnesota and North Dakota ("the Union") petitions for review of a decision of the National Labor Relations Board ordering the Union to cease and desist violating § 8(b)(4)(ii)(B) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(b)(4)(ii)(B), by coercing Lake Area Fence, a newly formed commercial fencing subcontractor, not to do fence installation work for Century Fence Company, a nonunion contractor. Concluding that the Board's decision is a reasonable construction of the statute and is supported by substantial evidence on the administrative record as a whole, we deny the petition for review and

grant the Board's cross-petition to enforce its Decision and Order.  See 29 U.S.C. § 160(e); NLRB v. Pipefitters, 429 U.S. 507, 528, 531 (1977) (standard of review).

**I.**

As relevant here, § 8(b)(4)(ii)(B) provides:  "It shall be an unfair labor practice for a labor organization or its agents . . . (4) . . . (ii) to threaten, coerce, or restrain any person . . . where . . . an object thereof is . . . (B) forcing or requiring any person . . . to cease doing business with any other person."  The statute is part of § 8(b)(4), in which Congress curbed the use of coercive and disruptive union actions undertaken to pressure a neutral or secondary employer (here, Lake Area) with the intent of forcing the neutral to cease doing business with a primary employer (here, Century) with which the union has an on-going collective bargaining dispute.  Ozark Interiors, Inc. v. Local 978 Carpenters, 957 F.2d 566, 568 (8th Cir. 1992).  "Restrictions on secondary boycotts . . . implement dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures and controversies not their own."  Sheet Metal Workers' Int'l Ass'n v. NLRB, 989 F.2d 515, 519 (D.C. Cir. 1993) (quotation omitted).

Section 8(b)(4) is a complex statute that "describes and condemns specific union conduct directed to specific objectives."  Local 1976, United Bhd. of Carpenters (Sand Door), 357 U.S. 93, 98 (1958).  The statutory landscape is even more complex in cases, such as this, which involve collective bargaining in the construction industry.  In 1959, Congress overruled the Supreme Court's Sand Door decision by amending § 8(b)(4) to add subsection (ii) and by enacting § 8(e), the "hot cargo" provision that prohibits collective bargaining agreements in which an employer agrees "to cease doing business with any other person," such as a secondary employer.  29 U.S.C. § 158(e).  But a proviso to § 8(e) states that it does not apply to agreements "in the construction industry relating to the contracting or subcontracting

of work to be done at [a construction job] site." See generally Woelke & Romero Framing, Inc. v. NLRB, 456 U.S. 645, 652-660 (1982). However, "regardless of whether an agreement is valid under [the construction industry proviso to] § 8(e), it may not be enforced by means that would violate § 8(b)(4)." Pipefitters, 429 U.S. at 521. That is the statutory intersection the Board confronted in this case.

## II.

The Union, on behalf of seven Minnesota local Laborers unions with 11,000 members, entered into a "pre-hire" Highway-Heavy agreement with a multi-employer group, the Associated General Contractors of Minnesota.[1] As permitted by the proviso to § 8(e), Article 16 of the Highway-Heavy agreement provides that a participating employer, "while subletting or contracting out laborers work at the job site . . . will sublet or contract such work only to a subcontractor who has signed or is otherwise bound by a written labor agreement" with the Union. Most construction sites in Minnesota are "union projects" in which the general contractor is a signatory party.

Century, based in Wisconsin, is a nonunion contractor that for many years has bid on and been awarded fencing contracts or subcontracts on union and nonunion projects in Minnesota. Century employs no laborers and does not perform fence installation work. Rather, it procures and delivers fencing materials and serves as "construction manager" for fencing work at the job site. For projects awarded to general contractors who are signatories to the Highway-Heavy agreement, Century

---

[1]Recognizing the unique history of bargaining in the construction industry, where employment at particular job sites tends to be transitory, § 8(f) allows unions and employers to enter into pre-hire agreements before the union has established majority status. 29 U.S.C. § 158(f). "Unlike bargaining agreements with majority-status unions, § 8(f) pre-hire agreements may be unilaterally repudiated after they expire." McKenzie Eng'g Co. v. NLRB, 303 F.3d 902, 908 n.3 (8th Cir. 2002).

uses only union-affiliated subcontractors to do work that is within the jurisdiction of local Iron Workers and Laborers unions.

Beginning in 2007, Laborers Local 563 began pressuring signatory general contractors not to enter into subcontracts with Century because it had no union agreement. Century approached the Union, offering concessions and arguing that its function as construction manager using union labor did not violate Article 16 of the Highway-Heavy agreement, but refusing the Union's demand that Century sign a union contract if it wished to continue to be awarded subcontracts on union projects in Minnesota. The Board's Administrative Law Judge (ALJ) found that, when Century refused the Union's demand, "the Union . . . expressed resultant hostility."[2]

The Union then turned its attention to neutral subcontractors performing Century's fence installation work. In 2008, a Union representative told Century that if it refused to sign a contract, the Union would not sign or renew § 8(f) agreements with any subcontractor who did business with Century; subcontractors could work with Keller Fence if they wished to continue working on union projects. Consistent with this threat, the Union refused to renew § 8(f) agreements with two Century subcontractors, Mid-America Fencing and Winslow Fencing. In response, Century filed a § 8(b)(4)(ii)(B) unfair labor practice charge. As part of a Settlement Agreement approved by the Board's Regional Director, the Union agreed:

> WE WILL NOT refuse to sign a collective bargaining agreement with or otherwise threaten coerce or restrain Mid-America Fencing, Winslow Fencing or any other person to force Mid-America Fencing, Winslow

---

[2]The reason for the Union's hostility is apparent. A Union witness testified that Keller Fence company, the largest Union signatory fence contractor, said "it would be nice" if Century became a signatory contractor because that would increase its labor costs on nonunion projects, creating a "level playing field" for Keller.

Fencing or any other person to stop doing business with Century Fence Company.

Mid-America and Winslow then regained their status as union subcontractors.

That brought the primary dispute between the Union and Century to April 2010, when Lake Area entered the picture. Owner Sharon Roush formed Lake Area as a fencing subcontractor satisfying minority business enterprise requirements. Roush had two employees, her son and an experienced union installer; she intended to work with Century and become a union-affiliated subcontractor because there was more union than nonunion work available. Roush met with Union representatives, signed the Highway-Heavy agreement subject to the Union's approval, and submitted the Union's new-contractor processing form. Union representatives appeared receptive until Roush disclosed that Lake Area intended to work with Century. Within one hour of this disclosure, the Union notified Lake Area that it would not sign an agreement. The explanation was that Roush had submitted incomplete information. Lake Area then filed this § 8(b)(4)(ii)(B) unfair labor practice charge.

The ALJ held an evidentiary hearing at which Roush and representatives of Century, Mid-America, and the Union testified at length. In a thorough opinion, the ALJ first credited the testimony of Roush and the Century and Mid-America representatives, rejecting as pretextual the Union President's testimony that he did not sign a contract with Lake Area because Roush had lied to him. On appeal, the Union does not challenge the ALJ's credibility findings. The ALJ then concluded:

> [T]he evidence demonstrates that the Union's intent in declining to allow Lake Area to become signatory to the Agreement was to force Century to become a signatory contractor by depriving it of subcontractors to work on union jobsites unless it agreed to a collective-bargaining agreement with the Union. It is inherent that in this method of persuading Century to become a union contractor, pressure must first

-5-

be applied to neutral secondary employers such as Lake Area, employers without the ability to influence the labor relations of Century. As the Board said in Limbach,[3] it is this secondary object -- to enmesh Lake Area in the Union's dispute with Century, with the aim of compelling the latter to become a signatory to a contract with the Union -- that renders the Union's otherwise legal refusal to enter into an 8(f) relationship with Lake Area, unlawful. Limbach, supra at 315. And it is exactly such neutral secondary employers as Lake Area that Congress, by enacting Section 8(b)(4)(B), intended to shield from secondary pressure, such as that imposed by the Union herein.

Acknowledging the Union's freedom not to enter into a § 8(f) agreement with new employer Lake Area unless its motive is unlawful, the ALJ rejected the General Counsel's request that the Union be ordered "to implement contractual terms that it has not agreed to." Instead, the ALJ recommended that, consistent with the remedy in Limbach, the Board order the Union to "cease and desist from threatening, coercing, or restraining Lake Area Fence, Inc. . . . with an object of forcing or requiring Lake Area Fence . . . to cease doing business with Century Fence Company." The Board, one member dissenting, agreed with the ALJ that Limbach "is not meaningfully distinguishable from this case." It affirmed the ALJ's findings and conclusions and adopted the cease-and-desist order recommended by the ALJ.

## III.

On appeal, the Union first argues that the Board's Order is contrary to a labor organization's freedom of contract, a fundamental policy of the National Labor Relations Act recognized in H.K. Porter Co. v. NLRB, 397 U.S. 99, 108 (1970). We agree with the Union that freedom of contract is an important right reserved to

---

[3]Local Union No. 80, Sheet Metal Workers (Limbach Co.), 305 NLRB 312 (1991), enf'd in relevant part, Sheet Metal Workers Int'l Ass'n v. NLRB, 989 F.2d 515 (D.C. Cir. 1993).

employers and unions in the federal labor laws. For that reason, earlier in these proceedings, a district court denied the Regional Director's request for a preliminary injunction under § 10(l) of the Act, 29 U.S.C. § 160(l), that would have "force[d] the Union to enter into and abide by an agreement that it did not make" with Lake Area. Osthus v. Laborers Dist. Council, 742 F. Supp. 2d 1042, 1048 (D. Minn. 2010). But freedom of contract is not an absolute right. "Various practices in enforcing the Act may to some extent limit freedom to contract as the parties desire." H.K. Porter, 397 U.S. at 108 n.6. The issue is whether the Union had an unfettered right to refuse a § 8(f) contract for a motive the Act declares to be unlawful. We think clearly not.

The NLRA's secondary boycott provisions do not require that the coercive conduct itself be unlawful. "Indeed, courts have routinely held that the otherwise legal exercise of rights afforded by a collective bargaining agreement can become unlawful when aimed at securing an objective prohibited by section 8(b)(4)." Brown & Root, Inc. v. La. State AFL-CIO, 10 F.3d 316, 323-24 (5th Cir. 1994) (collecting cases). "[A]n improper motive may make unlawful what is otherwise unassailable conduct." Limbach Co. v. Sheet Metal Workers Int'l Ass'n, 949 F.2d 1241, 1255 (3d Cir. 1991) (en banc). "The right of a union unilaterally to terminate a contractual relationship for legitimate reasons . . . does not extend to terminating for a purpose of applying economic coercion to achieve a prohibited secondary objective." Gottfried v. Sheet Metal Workers' Int'l Ass'n, 876 F.2d 1245, 1251 (6th Cir. 1989). Therefore, the Board and reviewing courts "look to the intention of parties in coercing neutral parties, not to the general rights of parties to take particular actions." Taylor Milk Co. v. Int'l Bhd. of Teamsters, 248 F.3d 239, 245 (3d Cir.), cert. denied, 534 U.S. 1055 (2001). For example, lawful union actions such as striking and picketing, filing grievances, withholding discretionary concessions, and peaceful group shopping have all been condemned as violating § 8(b)(4) when employed for the

purpose of putting coercive economic pressure on a neutral employer to further the union's proscribed secondary objective.[4]

Alternatively, the Union argues that the Board's remedy in this case violates the fundamental policy because it "amounts to a directive . . . that the Union cannot continue to exercise its freedom of contract." But the order contains no such directive. As in Limbach, the Board and the ALJ rejected the NLRB General Counsel's request for such a remedy, instead ordering only that the Union cease and desist from the coercion of a secondary employer made unlawful by § 8(b)(4)(ii)(B). The Board's remedy gives Lake Area a fresh opportunity to become a signatory subcontractor, while recognizing the Union's right to reject a § 8(f) agreement with Lake Area for any lawful reason. Given its repeated practice of coercing Century subcontractors, Union officials may find it difficult to refuse to enter into or to renew § 8(f) agreements with fencing subcontractors who meet objective standards of acceptable contracting parties. But if so, that will be the result of the Union's prior unlawful actions, not a violation of the fundamental policies of the NLRA.

More intriguing questions are raised by the Union's contention that the Board erred in concluding that the Union engaged in the requisite coercion.[5] The applicable standard of review controls our resolution of this issue. The Union strives to pose a question of law, arguing that choosing not to enter into a contract *cannot* be unlawful coercion within the meaning of § 8(b)(4)(ii)(B) because § 8(f) agreements are wholly voluntary. But it is the effect on the secondary employer, not the lawfulness of the

---

[4]See Limbach, 949 F.2d at 1253; Local Union No. 25, Int'l Bhd. of Teamsters v. NLRB, 831 F.2d 1149, 1153-54 (1st Cir. 1987); Sheet Metal Workers, Local Union No. 91 v. NLRB, 905 F.2d 417, 424 (D.C. Cir. 1990); Pye v. Teamsters Local Union No. 122, 61 F.3d 1013, 1024 (1st Cir. 1995).

[5]The Union does not challenge the Board's fact-intensive finding of the other element of a § 8(b)(4)(ii)(B) violation -- that the Union acted with the intent of forcing Lake Area to cease doing business with Century.

underlying action, that is the critical inquiry. The Board has long defined "coercion" to include "economic retaliation or pressure in a background of a labor dispute," defining such conduct to include "refusing to execute a collective-bargaining agreement or to refer workers." Sheet Metal Workers Local 91 (Schebler Co.), 294 NLRB 766, 775 (1989), enf'd in relevant part, 905 F.2d 417, 424 (D.C. Cir. 1990); accord Associated Gen. Contractors of Cal., Inc. v. NLRB., 514 F.2d 433, 438 (9th Cir. 1975) (coercion includes "any form of economic pressure of a compelling or restraining nature"). Except where First Amendment concerns may require greater caution,[6] the Board's interpretation of coercion is entitled to deference. See Pye, 61 F.3d at 1023.

The Union's legal argument is contrary to the Board's decision in Limbach that a union engaged in unlawful coercion by refusing to renew a secondary employer's § 8(f) contract. Because the dispute involved multiple local unions, the Board's construction of the statute was ultimately upheld by three of our sister circuits. See Sheet Metal Workers, 989 F.2d at 520-22; Limbach, 949 F.2d at 1256-57; Gottfried, 876 F.2d at 1251. The Union attempts to distinguish Limbach because it involved the repudiation or refusal to renew existing § 8(f) agreements with an established company. We agree with the Board that, in construing the statutory prohibition on secondary coercion, there is no meaningful *legal* distinction between refusing to renew an expired § 8(f) agreement, and refusing to enter into an initial § 8(f) agreement. We note, too, that the Union in settling Century's prior § 8(b)(4)(ii)(B) charge broadly agreed that it would not "refuse to sign a collective bargaining agreement with . . . Mid-America Fencing, Winslow Fencing *or any other person* in order to force" that person to stop doing business with Century.

---

[6]Such as cases involving peaceful picketing or handbilling. See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 577-78 (1988). This case involves the Union's economic pressure on Century's subcontractors, not its earlier efforts to persuade general contractor signatories not to subcontract with Century.

The Union also argues that its actions were not *in fact* economically coercive because Lake Area had no prior union affiliation, had no right to union affiliation, and could continue working as Century's nonunion fencing subcontractor on the one nonunion project that Lake Area had obtained. This is a serious issue. But it is fact intensive. Applying the deferential substantial evidence standard of review, we conclude the Board's decision must be upheld.

Even though Lake Area had no right to a § 8(f) contract, the record established that Roush formed the new company with a reasonable expectation of becoming a union fencing subcontractor. The Union's control over signatory status is a "powerful economic weapon" when that status dictates an employer's access to union projects and workers. Limbach, 949 F.2d at 1256. Here, because of Article 16 of the Highway-Heavy agreement, the Union's refusal barred Lake Area from all union projects in Minnesota at a time when more union than nonunion work was available. It also deprived Lake Area of the other benefits of union association, such as a ready supply of trained labor, and it crippled the fledgling enterprise's union-oriented business plan -- a plan the Union should have applauded. In these circumstances, the Board reasonably concluded that the Union's refusal went beyond lawfully persuading Lake Area to cease doing business with Century and reached the level of unlawful secondary coercion through the application of compelling economic pressure. See NLRB v. IBEW, 405 F.2d 159, 161-62 (9th Cir. 1968) (Board reasonably found unlawful economic coercion when threatened § 8(f) contract termination would make the employer an "ineligible business associate in the eyes of . . . other [union-affiliated] contractors"), cert. denied, 395 U.S. 921 (1969).

For the foregoing reasons, we deny the Union's petition for review and grant the Board's cross-petition to enforce its Decision and Order.

_____

-10-